OPINION OF THE COURT
Harold B. Beeler, J.
*872 The defendant moves to suppress hospital supplies which he is alleged to have stolen from New York Presbyterian Hospital, formerly known as Columbia Presbyterian Hospital (hereinafter referred to as the Hospital). These supplies include items seized from the defendant by Hospital security on August 13, 1998 and a quantity of items seized from his home pursuant to a search warrant executed the following day. Defendant also moves to suppress a statement he made to Hospital security on August 13, 1998. On July 28 and 29, 1999, this court presided over a hearing during which the People called three witnesses: Senior Special Agent Rose McNamara of the United States Customs Service and Special Police Officers Thomas Taylor and Sean Bueford, of Hospital security. Based upon the credible testimony adduced at the hearing as well as the memoranda of law submitted by both parties, the court makes the following findings of fact and conclusions of law:
FACTS
In February of 1998, Senior Special Agent Rose McNamara was working at JFK International Airport for the United States Customs Service. She was a member of the “Outbound Team,” which had been formed after the TWA 800 crash to focus greater attention on outgoing cargo and passengers. On February 17, 1998, Agent McNamara assisted Inspector Debbie Brown in the seizure of a large shipment of goods bound for Haiti. Initially, Inspector Brown had targeted the shipment because the cargo airway bill indicated that it contained medical supplies, and she was concerned that it might contain hazardous materials. Inspector Brown notified Agent McNamara and together they examined the contents of the entire shipment.
The examination disclosed numerous apparent shipping violations. The shipment as a whole appeared to be undervalued and it contained various items which were improperly documented or packaged. There was ammunition which required a special license and there were sternos which required special packaging. In addition, there were inadequately identified pharmaceuticals which Agent McNamara was concerned might be controlled or narcotic substances. She also noticed numerous boxes of identification bracelets and sutures with Columbia Presbyterian labels on them. Agent McNamara contacted the Food and Drug Administration regarding the pharmaceuticals, and the Hospital regarding the labeled medical supplies.
*873 Through these inquiries Agent McNamara learned that the defendant, who was listed as the sender on the airway bill, was an employee of the Hospital, but she could not resolve her questions about the genesis of the medical supplies. She therefore arranged to interview the defendant on April 15, 1998. Prior to questioning the defendant, Agent McNamara advised him of his Miranda rights. The defendant told Agent McNamara that all of the drugs and supplies had been obtained from friends or had been discarded by the Hospital. The defendant showed Agent McNamara records of numerous comparable shipments which he had made throughout his 12 years of employment at the Hospital.
Subsequent to her conversation with the defendant, Agent McNamara contacted Special Police Officer (SPO) Thomas Taylor, who was the Investigations Manager at New York Presbyterian Hospital. SPO Taylor denied that the Hospital would discard drugs or supplies in the manner described by the defendant. He also informed the Agent that recently the defendant had requested a leave of absence, and that his prior leaves of absence had coincided with trips to Haiti.
Based upon all of the above information, Agent McNamara believed that there was probable cause to obtain a warrant for the defendant’s arrest. She contacted the United States Attorney’s Office in the Eastern District, which declined to prosecute because the value of the property stolen was too small. Thereafter, she contacted the Manhattan District Attorney’s Office.
While awaiting word from Agent McNamara as to how Customs intended to proceed against the defendant, SPO Taylor began his own internal investigation. He went to the Customs office to examine the seized shipment and attempted to link the seized items with shipments made to the Hospital. SPO Taylor learned from the Allegiance Medical Supply Company that the lot numbers listed on the boxes of medical supplies seized by United States Customs matched the lot numbers of shipments that had been delivered to the Hospital. SPO Taylor informed Hospital security about the ongoing investigation and instructed them to search the defendant pursuant to Hospital policy if they observed him attempting to leave the Hospital with an oversized bag. According to SPO Taylor, the Hospital’s policy was posted at each entrance and exit notifying employees that any bag leaving the hospital was subject to being searched.
On August 13, 1998, Special Patrol Officer Sean Bueford was assigned as a plainclothes security guard at the Hospital. At *874 approximately 7:30 p.m., he noticed the defendant, who he knew to be the subject of an ongoing investigation, standing at the admissions desk. The defendant then went downstairs toward an employee locker room area. SPO Bueford followed him and waited outside of the locker room for 12 to 15 minutes. When the defendant emerged he was wearing a different jacket and he was carrying a slightly oversized black plastic bag which he had not had earlier. SPO Bueford followed the defendant back to the main floor and stopped him when he passed the first of two exit doors.
Displaying his Hospital security identification, SPO Bueford requested that the defendant step back inside the lobby and show him the contents of the black plastic bag. The defendant hesitated, trying to convince SPO Bueford that the bag was innocuous, stating, “no, no its nothing. It’s just my dinner.” Noticing the outline of boxes through the bag, SPO Bueford referred defendant to the Hospital policy and repeated his request until the defendant reluctantly acquiesced. A search of the bag disclosed some food, but also produced several boxes of Hospital sutures similar to those in the shipment seized by Customs. The defendant was taken to the Hospital security office where he was formally arrested.
The following day, based upon the affidavit of SPO Taylor, a search warrant was obtained for defendant’s apartment. When executed, the police recovered a substantial quantity of Hospital supplies, which seizure led to the instant indictment.
CONCLUSIONS OF LAW
Defendant is charged in this indictment only with respect to the property seized by SPO Bueford from his person on August 13, 1998 and the property recovered from his apartment pursuant to a search warrant executed by SPO Taylor the following day. No charges were brought in connection with the shipment seized by Customs on February 17, 1998. Nonetheless, a determination as to the legality of this seizure is critical to assessing the legality of all subsequent State action.
It is well established that neither a warrant nor probable cause is required for the brief detention of persons entering the country as well as routine inspections of luggage without violating the constitutional proscriptions against unreasonable searches and seizures. (People v Luna, 73 NY2d 173 [1989].) Such searches made pursuant to the sovereign’s right to protect itself by stopping and examining persons and property entering the country are reasonable “simply by virtue of the fact *875 that they occur at the border.” (United States v Ramsey, 431 US 606, 616 [1977].)
While a routine border search requires no articulable suspicion to be deemed reasonable, greater intrusions to an individual’s privacy, such as a pat down or body search, must be justified by some level of suspicion. (United States v Bareno-Burgos, 739 F Supp 772 [ED NY 1990]; People v Materon, 107 AD2d 408 [2d Dept 1985].) In evaluating nonroutine border searches, the courts have adopted a flexible test under which the degree of suspicion is correlated to the level of intrusion, (United States v Vega-Barvo, 729 F2d 1341 [11th Cir 1984].) The amount of suspicion necessary to justify the search increases as the search becomes more intrusive. (Supra, at 1344.)
Although the border exception is “as old as the Fourth Amendment itself’ (United States v Ramsey, 431 US 606, 619 [1977], supra), it is only in the last 20 years that the Federal courts have resolved that it applies to outgoing as well as incoming goods. (United States v Ezeiruaku, 936 F2d 136 [3d Cir 1991].) In United States v Stanley (545 F2d 661, 667 [9th Cir 1976], cert denied 436 US 917 [1978]), the first reported decision explicitly applying the border exception to outgoing goods, the court reasoned: “both incoming and outgoing border-crossing searches have several features in common: (1) the government is interested in protecting some interest of United States citizens, such as restriction of illicit international drug trade, (2) there is a likelihood of smuggling attempts at the border, (3) there is difficulty in detecting drug smuggling, (4) the individual is on notice that his privacy may be invaded when he crosses the border, and (5) he will be searched only because of his membership in a morally neutral class.”
Since Stanley {supra), every Federal Circuit Court which has considered the issue has extended the border exception to outgoing goods. This includes: the Second Circuit (United States v Ajlouny, 629 F2d 830 [2d Cir 1980], cert denied 449 US 1111 [1981]; United States v Swarovski, 592 F2d 131 [2d Cir 1979]); Third Circuit (United States v Ezeiruaku, 936 F2d 136 [3d Cir 1991], supra); Eighth Circuit (United States v Udofot, 711 F2d 831 [8th Cir], cert denied 464 US 896 [1983]); Ninth Circuit (United States v Stanley, 545 F2d 661 [9th Cir 1976]); and Eleventh Circuit (United States v Hernandez-Salazar, 813 F2d 1126 [11th Cir 1987]; United States v Vega-Barvo, 729 F2d 1341 [11th Cir 1984], supra).
Notwithstanding the unanimity in the Federal system, defendant argues that New York, by virtue of its decision in *876 People v Esposito (37 NY2d 156 [1975]), has taken a contrary position and rejected the application of the border exception to outgoing goods. Defendant’s interpretation of the significance of Esposito is misplaced for several reasons.
First, Esposito (supra) was decided in 1975, before Stanley (supra) and all of the other Federal decisions extending the border exception to outgoing goods. As such the Court of Appeals in Esposito did not consider and reject the current Federal rule, but merely restated the rule that was then in effect in both the Federal and State courts.
Second, the critical issue in Esposito (supra) was not the scope of the border exception, but whether local law enforcement would be permitted to use Federal officials to circumvent constitutional prohibitions. In Esposito, local airline and police officials suspected baggage handlers at Kennedy International Airport of stealing from passengers’ baggage on incoming and outgoing international flights. Unable to pursue their investigation by constitutional means, they decided to use Federal customs officials on the assumption that they were not subject to the same proscriptions. In overturning the search, the Court of Appeals stated: “[T]he ‘border search’ exception to the requirement of probable cause accorded to customs * * * [citations omitted] is a limited power. Its purpose is to permit such officials to search for contraband coming into the country without payment of duty or in contravention of statutory prohibitions. It does not extend to searches of baggage going out of the country upon which no duty is payable and on which no prohibitions are placed. [Citations omitted; emphasis in original.] As these cases make clear, the limited exception was granted to customs officials for a particular purpose; it may not be used to circumvent the constitutional requirement of probable cause placed upon police officers.” (People v Esposito, supra, at 159-160 [emphasis added].) Thus, the core evil which the Court of Appeals sought to address in Esposito was the misconduct of local law enforcement in using Federal Customs agents to conduct a local investigation by unlawful means. It is for this proposition that Esposito continues to be cited, not for its discussion of the scope of the border exception. (People v LePera, 197 AD2d 43 [4th Dept 1994].) Moreover, no appellate court in New York has dealt directly with the application of the border exception to outgoing goods since Esposito was decided. And, in this court’s opinion, Were the Court of Appeals to address this issue today, it would adopt the rule in effect in virtually every Federal Circuit.
*877 Nonetheless, even if New York were to reject the prevailing Federal standard and require some degree of suspicion before permitting the search of outgoing property at the border, the search in this case would still be upheld. Defendant’s shipment was targeted for examination because the airway bill indicated that it contained medical supplies which led the Customs inspector to be concerned about potential hazardous materials. Exportation of hazardous materials, including hazardous medical materials, is a highly regulated activity subject to close scrutiny by Federal officials. (See, 42 USC § 6938 [“Export of hazardous wastes”]; 49 USC ch 51 [“Transportation of Hazardous Material”].) Accordingly, not only was the examination permissible under the border exception, but it was an appropriate and reasonable exercise of Federal authority in view of the significant Federal interest in regulating the transport of hazardous medical materials. Moreover, the existence of this distinct and substantial Federal interest distinguishes this case from those cases in which New York courts have found it unlawful for Federal officials to seize evidence which is only relevant to State prosecutions. (See, People v Esposito, supra [seizure of stolen ties from the baggage handler]; People v LePera, 197 AD2d 43 [4th Dept 1994], supra [seizure of gambling records]; People v Regnet, 111 Misc 2d 105 [Sup Ct, Erie County 1981] [seizure of a stolen credit card].)
Once the shipment was examined and various obvious violations of Federal shipping regulations were discovered, Agent McNamara was justified in pursuing her investigation and in contacting Federal and State prosecutors. (People v Materon, 107 AD2d 408 [2d Dept 1985], supra.) Based upon the entirety of the investigation between February and August — including the admissions made by defendant to Agent McNamara, proof that lot numbers on the seized supplies matched lots of supplies delivered to the Hospital, and Hospital security’s denial that the defendant could have obtained the supplies in the manner he indicated — the police, on August 13, 1998, already had probable cause to arrest the defendant in connection with the shipment seized in February. The court rejects the defendant’s argument that the information derived from the seizure was stale by August. While the defendant might have preferred that authorities wrap up their investigation more quickly, there is no legal requirement that they do so, especially in view of the evidence that the offense was an ongoing one. (People v Clarke, 173 AD2d 550 [2d Dept 1991].) Moreover, the defendant’s attempt to leave the hospital with an *878 oversized bag which appeared to contain boxes only confirmed all prior information.
Having found that the arrest was based upon probable cause, the court need not address the validity of the Hospital’s policy of randomly searching employee bags. Were the court to reach this question, however, the court concurs with the defendant that the policy in question would be unauthorized. Applying the standards set out by the Southern District in Chenkin v Bellevue Hosp. Ctr. (479 F Supp 207 [SD NY 1979]) the testimony at the hearing failed to establish that there was a strong public necessity for the policy; that the search policy provided an effective means to achieve the public goal and that the manner of implementing the policy was reasonable under the circumstances. Moreover, it was quite clear from the testimony that the search conducted in this case was not a random one, but a specifically focused one predicated on significant prior information about the conduct of this particular defendant.
Finally, the court finds that the search of the plastic bag in the defendant’s possession was lawful as a search incident to a lawful arrest. (People v Wylie, 244 AD2d 247 [1st Dept 1997].) A warrantless search of an arrested person or the area within his immediate control is “ ‘grounded in protecting the safety of the arresting officer by permitting him to search for and seize weapons when there is reason to fear for his safety and in preventing the person arrested from destroying evidence of criminal involvement by permitting the arresting officer to search for and seize such evidence.’ ” (Supra, at 249.) It is immaterial whether the evidence is seized immediately before or simultaneously with the arrest. (People v McLeod, 161 AD2d 671 [2d Dept 1990].)
As to the search warrant, in a written decision dated April 21, 1998 this court already denied defendant’s motion to controvert the warrant on the grounds that the information contained in the affidavit was stale and that there was no probable cause to believe the items sought would be found in the defendant’s apartment. In that decision the court deferred a final determination on the admissibility of the seized evidence pending the results of this hearing. Having found that the prior conduct of both Customs officials and the police were entirely lawful, the court now finds that the evidence seized in connection with the search warrant is admissible.
With respect to defendant’s statement, the court finds that the defendant was not in custody when the statement was *879 made and therefore no Miranda warnings were required. (People v Huffman, 41 NY2d 29 [1976].)
Accordingly, defendant’s motion to suppress is denied in all respects.