**Luis Jesus PENA, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 13-00-00636-CR.**

Court of Appeals of Texas,
Corpus Christi.

Nov. 21, 2001.

---

Angel Castro, Brownsville, for Appellant.

David W. Hartmann, Asst. County (Cr. Dist.) Attorney, Yolanda De Leon, District Attorney, Brownsville, for the State.

Before Justices HINOJOSA, YAÑEZ, and CASTILLO.

## OPINION

Opinion by Justice CASTILLO.

Appellant, Luis Jesus Pena, was charged in a single indictment with the offenses of possession of cocaine and heroin, both in the amount of more than one gram but less than four grams. The indictment also included an enhancement paragraph. Appellant filed a motion to suppress and, after a pretrial hearing on the motion, the trial court denied appellant's motion to suppress. Appellant then pled guilty with a plea bargain agreement. As part of the plea bargain agreement, the charge of possession of cocaine was dismissed, and appellant was sentenced to four years confinement on the second degree felony possession of heroin. Pursuant to Texas Rule of Appellate Procedure 25.2(b)(3)(B), he brings this appeal. In a single issue, he complains of the trial court's decision on the motion to suppress. We affirm.

### Factual Background

On June 10, 2000, Luis Jesus Pena was a passenger in a taxi about two blocks from an international bridge in Brownsville, in line to cross the bridge into Mexico. That day, the United States Customs Service and the Texas Department of Public Safety vehicle anti-theft unit ("DPS") were participating in an operation called Operation Gate. As part of Operation Gate, DPS was looking for stolen vehicles and vehicles with altered VIN plates while Customs was looking for persons taking weapons, ammunition or currency in excess of $10,000 across the bridge. Roberto Rivera, a senior inspector with the Customs Service, targeted the taxi appellant was riding in for inspection.[1] In the taxi were appellant, the driver and one other person. Rivera stopped the taxi, had it pull over, and began questioning appellant about where he was coming from and whether he was carrying any firearms or ammunition or more than $10,000 in cash. Appellant answered that he came from Dallas and did not have anything on him but Rivera

---

1. Appellant testified that an officer from Brownsville Police Department made contact with him but Inspector Rivera testified that the police department was not present.

noticed that appellant had become very nervous, fidgeting in his seat. Rivera then asked for identification and appellant answered, "The only thing I have is this" and took out his social security card. When appellant pulled the social security card out of his wallet, Rivera noticed an identification card from a correctional facility and asked appellant what he had been in jail for. Appellant was trembling and shaking when he handed Rivera the social security card and to Rivera's question he responded that he had been to jail for stealing cars. Rivera then turned to DPS Sergeant Joel Garcia and told him that appellant had been to jail before for stealing cars. Garcia then indicated that he would like to talk to appellant.

Rivera then asked appellant to get out of the taxi and gave him a "pat-down" for officer safety. Rivera noted an odd bulge in appellant's left-hand pocket but did not take it out because it did not feel like a weapon. Rivera thought the bulge was currency but could not tell from the pat-down. The customs agent then walked appellant over to Sgt. Garcia and stepped back about two to three feet until Garcia finished speaking with the subject. Rivera at that point considered appellant to have become Sgt. Garcia's subject because Garcia was doing the questioning, but Rivera had not yet finished his investigation of appellant and planned on continuing it after Garcia finished speaking to appellant. During the course of Garcia's questioning, Garcia asked appellant if he had anything in his pockets. Appellant did not answer but reached into his right-hand pocket and pulled out something while fidgeting from leg to leg. Rivera did not see appellant make any attempt to put his hand in his left-hand pocket.[2] Rivera then asked appellant what he had in his left pocket and

saw appellant go limp in resignation. Rivera did not recall whether he then reached in appellant's pocket or whether appellant reached in his pocket himself to pull out some aluminum foil. Appellant testified that Rivera came forward, reached in his pocket and pulled out a small package. Rivera described the package as a wad of aluminum foil which contained three individual aluminum packets, a small one with a white powdery substance, which later tested positive for cocaine, a second one with a brown powdery substance, which later tested positive for heroin, and a third larger packet with a white powdery substance that tested negative for controlled substances. Rivera then took appellant into custody.

Agent Rivera also testified that appellant's behavior caused him to think that appellant might have one of the items that Rivera had inquired about and the agent thought appellant might be concealing it in his left-hand pocket. In response to questioning from the court, Rivera testified that it was part of a routine border search to ask people if they had anything in their pockets and to ask them to empty their pockets.

Appellant testified that he did not consent to the search. There was no dispute that there was no arrest warrant obtained.

The trial court denied the motion to suppress and made an oral finding of law that routine border searches were authorized on no suspicion and non-routine searches were authorized on suspicion alone. He also made three oral findings of fact: 1) the search was a routine border search; 2) the "officers" had a reasonable suspicion; and 3) the search was made by U.S. Customs and not the Brownsville Police Department. No written findings of

2. Appellant testified that he took out a lighter from his left-hand pocket and then put it back in but did not take out the items making the bulge in his pocket.

fact or conclusions of law were made or requested.

## Analysis

In his sole point of error, appellant argues that the trial court erred in finding that the search was a routine border search because the detention outside of the taxi was by order of the DPS trooper, not the Customs agent, and thus there must be a showing of reasonable suspicion by the trooper for the detention. The State responds that appellant was never in the custody of the trooper, but rather was always under the control of the Customs agent, and so the law relating to border searches was properly applied.

### A. *Standard of Review*

■ We review motions to suppress under the standards set forth in *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App. 1997). The standard of appellate review depends on the type of questions presented. *Guzman* recognizes three different categories of questions and provides the appropriate standard for each.

■ The first category of questions involves those relating to the trial court's determination of the historical facts supported by the record, especially those in which the fact findings are based on an evaluation of credibility and demeanor. *Guzman*, 955 S.W.2d at 89. As to questions in that category, the appellate courts should afford almost total deference to the trial court's determination. *Id.*

■ The second category is that of trial court rulings on "application of law to fact questions" also known as "mixed questions of law and fact" where the resolution of those ultimate questions turns on an evaluation of credibility and demeanor. *Id.* An appellate court reviews questions in this category under the same standard as those

in the first, affording almost total deference to the trial court's rulings. *Id.*

■ The final category is that of "mixed questions of law and fact" which do not fall into the second category, that is, do not turn on an evaluation of credibility and demeanor. *Id.* In that circumstance, the trial court " 'is not in an appreciably better position' than the appellate court to decide the issue" and hence *de novo* review is appropriate. *Id.* However, the reviewing court should still afford deference to the trial court on the subsidiary factual questions which themselves would fall into the first category. *Id.*

■ Most reviews of motion to suppress cases will be under a bifurcated standard, in which the historical determination made by the trial court will be accorded total deference while the application of the law to the facts will be analyzed under a *de novo* standard of review. *State v. Ross*, 32 S.W.3d 853, 856 (Tex.Crim.App. 2000). Where there is uncontroverted evidence and there is no evidence that the trial court disbelieved the testimony, *de novo* review is appropriate. *Id.* at 858. Even where the evidence is controverted and thus credibility and demeanor are factors, if the issue to be decided does not *turn on* credibility or demeanor, a *de novo* standard applies to the review of the application of law to facts. *Loserth v. State*, 963 S.W.2d 770, 772–73 (Tex.Crim.App. 1998) (emphasis added). While the evidence in the present case was controverted, it is clear that the issue to be decided did not turn on credibility or demeanor. Accordingly, we will grant almost complete deference to the trial court's finding of the historical facts and review *de novo* the application of the law to the facts. In the present case, the trial court pronounced what apparently were meant to be oral findings of facts and we will accord defer-

ence to the same.[3] However, we "need not assign the same weight or significance to such facts as the trial court in deciding the ultimate issues before us." *Gutierrez v. State*, 22 S.W.3d 75, 80 (Tex.App.—Corpus Christi 2000, no pet.) (citing *Loserth*, 963 S.W.2d at 774). Where the trial court does not make express findings on underlying historical facts, we will view them in a light most favorable to the trial court's decision. *Loserth*, 963 S.W.2d at 774.

## B. Border Searches

 It has long been recognized that Customs agents have virtually unfettered authority to search incoming persons at the border. *United States v. Sandler*, 644 F.2d 1163, 1165 (5th Cir.1981). Due to the "Government's sovereign authority to protect itself," the "border search doctrine is an exception to the Fourth Amendment requirement of probable cause." *Aycock v. State*, 863 S.W.2d 183, 185 (Tex.App.—Houston [14th] 1993, pet. ref'd). The border search doctrine also applies to a search for the transport of monetary instruments of more than $10,000, whether the person

being investigated is entering the United States or exiting the United States. *United States v. Berisha*, 925 F.2d 791, 794 (5th Cir.1991).[4] Indeed, a Customs agent is given specific statutory authority to make such a search under 31 United States Code § 5317.[5] 31 U.S.C.A. § 5317(b) (West Supp.2001).

 A customs inspector may do a routine border search with no suspicion at all. *Sandler*, 644 F.2d at 1165; *Berisha*, 925 F.2d at 794. Routine searches include the search of a person's outer clothing, personal effects, pockets, wallet, and purse. *Sandler*, 644 F.2d at 1169; *United States v. Grotke*, 702 F.2d 49, 51 (2nd Cir.1983) (citing *Henderson v. United States*, 390 F.2d 805, 808 (9th Cir.1967) and *United States v. Carter*, 592 F.2d 402, 405 (7th Cir.1979)). More intrusive searches, like a body cavity search, require reasonable suspicion. *United States v. Cardenas*, 9 F.3d 1139, 1148, n. 3 (5th Cir.1993) (citing *United States v. Montoya de Hernandez*, 473 U.S. 531, 538, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985)).

3. *See State v. Groves*, 837 S.W.2d 103, 105 n. 5 (Tex.Crim.App.1992) (where trial court clearly intended oral pronouncements to be an expression of his findings of facts and conclusion of law, they were reviewed by the appeals courts as such).

4. The Fourteenth Court of Appeals has held that the border search exception applies to all departing travelers, without qualification as to the type of search. *Aycock v. State*, 863 S.W.2d 183, 187 (Tex.App.—Houston [14th] 1993, pet. ref'd). The court relies on language in *California Bankers Assoc. v. Shultz*, 416 U.S. 21, 83, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974). The language relied on by *Aycock* has rightly been pointed out as dictum. *United States v. Salinas–Garza*, 803 F.2d 834, 836 n. 5 (5th Cir.1986). Further, a number of the cases cited by the *Aycock* court for support of this proposition, even though they may have used broad language, actually dealt with searches for currency. *See* discussion of

cases in *United States v. Roberts*, 86 F.Supp.2d 678, 684 (S.D.Texas 2000) (finding that "no case has explicitly held that the border search exception applies identically to searches of persons or property entering and exiting the country and without regard to the purpose of the search"). We adopt the conservative approach of the *Berisha* court and express no opinion on searches for exportation of items other than monetary instruments. *United States v. Berisha*, 925 F.2d 791, 795, n. 8 (5th Cir.1991).

5. That section reads in relevant part:
 (b) Searches at border. For purposes of ensuring compliance with the requirements of section 5316, a customs officer may stop and search, at the border and without a search warrant, any vehicle, vessel, aircraft, or other conveyance, any envelope, or other container, and any person entering or departing the United States.
 31 U.S.C.A. § 5317(b) (West Supp.2001).

Additionally, customs agents may make an "extended border" search some distance from the actual border or after some passage of time after the initial border crossing "when the totality of the circumstances surrounding the search, including the time elapsed after the initial border crossing and distance from the border, 'are such to convince the fact finder with reasonable certainty that any contraband which might be found in or on the vehicle at the time of the search was aboard the vehicle at the time of entry into the jurisdiction of the United States'," such as when there is continual surveillance. *United States v. Espericueta–Reyes,* 631 F.2d 616, 619–20 (9th Cir.1980) (quoting *Alexander v. United States,* 362 F.2d 379, 382 (9th Cir.1966)). Further, simply because customs agents have already inspected a person at a crossing point does not mean that they may not conduct additional border search examinations of that person within the immediate vicinity of the crossing point, particularly where the person remains in the continuous custody of the customs authority. *Government of the Canal Zone v. Eulberg,* 581 F.2d 1216, 1218 (5th Cir.1978).

### C. Reverse "Silver-platter," Agency and Cooperative Efforts

Evidence that is obtained by federal agents acting lawfully and in conformity with federal authority is admissible in state proceedings. *Gutierrez,* 22 S.W.3d at 84. This has been referred to as the "reverse silver-platter" doctrine. *Id.* The underlying concept of the "reverse silver-platter" doctrine is that "protections afforded by the constitution of a sovereign entity control the actions only of the agents of that sovereign entity." *State v. Toone,* 823 S.W.2d 744, 748 (Tex.App.— Dallas 1992), *aff'd on other grounds,* 872 S.W.2d 750 (Tex.Crim.App.1994). Thus a state constitution will not be applied to control the conduct of officers of a foreign jurisdiction. *State v. Mollica,* 114 N.J. 329, 554 A.2d 1315, 1325 (1989). Simply put, "state constitutions do not control federal action." *Id.* at 1327.

However, the question of the applicability of constitutional standards for the jurisdiction in which the evidence is sought to be introduced is not simply swept aside because the evidence was seized by officers of another jurisdiction. The critical element in the application of the reverse-silver platter doctrine is

> the agency *vel non* between the officers of the forum state who seek to use the evidence and the officers of the state who obtained the evidence. It is this element—the presence or absence of agency between the officers of the two sovereigns—that determines the applicability of the constitutional standards of the forum jurisdictions ... [Thus] the nature of the relationship between the officers participating in the search and seizure and the officers seeking to make use of such evidence is critical.

*Id.* at 1326, 1327.

Because federal officers operate throughout all the various states, in the exercise of federal jurisdiction, under federal authority, and in accordance with federal standards, they are treated in state court as officers from another jurisdiction. *Id.* at 1327. Thus, the general rule is that evidence seized by federal agents, acting lawfully and in conformity with federal standards, will be admissible in state courts, even though the actions of the federal agents may not have met a higher burden imposed by the state constitution. *Gutierrez,* 22 S.W.3d at 84; *Toone,* 823 S.W.2d at 748 (citing *Mollica,* 554 A.2d at 1328). This rule, however, is subject to a significant caveat. Where the State seeks to introduce evidence seized by federal

action, it is vital that the action "not be alloyed by any state action or responsibility." *Mollica,* 554 A.2d at 1329. In other words, federal agents "may not act as agents of the state police or 'under color of state law'." *Toone,* 823 S.W.2d at 748(citing *Mollica,* 554 A.2d at 1329). Customs agents are given special privileges to search without probable cause at the border for a particular purpose; the border search exception "may not be used to circumvent the constitutional requirement of probable cause placed on police officers." *People v. Esposito,* 37 N.Y.2d 156, 371 N.Y.S.2d 681, 332 N.E.2d 863, 865–66 (1975).

 Accordingly, if customs agents are not acting pursuant to the special powers granted them and are instead acting as agents for the state police, they are subject to the same constitutional standards applied to the state police and evidence seized by agents while operating in such capacity is subject to exclusion if not seized according to those standards. *Id.* Thus, state participation in a federal search that did not comport with state constitutional protections could preclude the use of any evidence obtained in state criminal proceedings, even if federal constitutional safeguards were observed. *Lockett v. State,* 879 S.W.2d 184, 190 (Tex. App.—Houston [14th] 1994, pet. ref'd). Where an operation involves actors from various jurisdictions then, the entire relationship must be examined to determine whether such agency is established as to bring the federal agents under the color of state law. *Toone,* 823 S.W.2d at 748; *Mollica,* 554 A.2d at 1329; *Lockett,* 879 S.W.2d at 190. As stated by the *Toone* court,

> Evidence of antecedent mutual planning, joint operations, cooperative investigations, or mutual assistance between state and federal officers may sufficiently establish agency and serve to bring

the conduct of the federal agents under the color of state law. Conversely, mere contact, awareness of ongoing investigations, or the exchange of information may not transform the relationship into one of agency.

*Toone,* 823 S.W.2d at 748.

 Not every joint operation, between state and federal actors, however, results in an agency relationship which would bring federal agents under the color of state law. Federal agents often work in conjunction with other law enforcement authorities to achieve federal objectives and such cooperation alone does not invalidate searches made as part of a joint effort. *See People of the Territory of Guam v. Villacrusis,* 992 F.2d 886, 887 (9th Cir.1993) (citing as an example Public Law Number 100–690, § 7640, 102 Stat. 4508 (1988) and holding that search by National Guardsman in the presence and under the direction of a customs officer valid). Given the specific authority granted customs agents to conduct border searches, there is no reason that the limited forces of the Customs Service cannot enlist the aid of other law enforcement entities in forming task forces to meet their needs. *United States v. Alfonso,* 759 F.2d 728, 735 (9th Cir.1985) (involving a task force composed of the Customs Service, Los Angeles City Police and County Sheriff's Departments, the Federal Bureau of Investigation, the Coast Guard, the Drug Enforcement Administration and the Los Angeles Port Enforcement Administration and searches conducted primarily by officers of the LAPD). In order for a search to be considered a federal search, rather than a state search, it is enough that a border search conducted during such a collaborative effort be "under the aegis of and in cooperation with Customs agents." *Id.* Similarly, where customs agents and agents from another agency

each had independent grounds for conducting a stop, the stop is not invalidated simply because there is such cooperation. *United States v. Odneal,* 565 F.2d 598, 602 (9th Cir.1977) (Customs Service and Coast Guard each had independent reasons for stop). It is the attempt by state agents to do indirectly what the Fourth Amendment prohibits them from doing directly, by using federal agents as a stalking-horse to circumvent Fourth Amendment requirements on the state's behalf, that is condemned.[6] *See Mollica,* 554 A.2d at 1328 (the essential objective of the state exclusionary rule is to deter unlawful state police conduct and thus no deterrence value for state officials is frustrated by admitting evidence seized by federal officers under the authority of, and in conformity with, federal law, since it is only the conduct of the federal jurisdiction's officials, not state officials that are involved) and *People v. Desnoyers,* 183 Misc.2d 871, 705 N.Y.S.2d 851, 857 (N.Y.Sup.Ct.2000) (distinct and substantial federal interest distinguished case from those found unlawful in which federal officials seized evidence only relevant to State prosecutions). The "core

evil" to be prevented is the "misconduct of local law enforcement agents in *using* Federal Customs agents to conduct a local investigation by unlawful means." *Desnoyers,* 705 N.Y.S.2d at 856 (emphasis in the original). It is the deterrence of illegal conduct by *state officials* which is sought. *See Toone,* 823 S.W.2d at 748.

▆▆▆ Accordingly, to determine whether the federal officials were operating as agents for the State of Texas rather than to achieve federal objectives in the instant case, we must review the reasons, motives, actions, and processes used by the officers to find, select, and seize the evidence. *See Mollica,* 554 A.2d at 1329.

### D. *Application of the law to the facts*

There is no question that this search took place at the border. Appellant concedes that the customs official had the right to detain, question, and search him as he was exiting the United States. It has been found by the trial court and is conceded by appellant that it was Customs Agent Rivera who actually physically conducted the search of appellant. The evidence also indicates that Trooper Garcia

---

**6.** On the nature of the relationship between state and federal agents (albeit in the reverse situation under the now essentially defunct silver-platter doctrine) in the consideration of the exclusion of evidence for alleged violations of constitutional rights see *Lustig v. United States,* 338 U.S. 74, 78, 69 S.Ct. 1372, 93 L.Ed. 1819 (1948) (evidence suppressed where federal agent actively participated in search with local police converting the state search into a federal search), *Gambino v. United States,* 275 U.S. 310, 316, 48 S.Ct. 137, 72 L.Ed. 293 (1927) (evidence suppressed where state troopers' actions in arresting, searching and seizing defendants done solely on behalf the federal government), *Shurman v. United States,* 219 F.2d 282, 287 (5th Cir. 1955) (evidence admissible where there was not such cooperation between federal agents and state police as to demonstrate an attempt by federal authorities to circumvent Fourth Amendment) and *Sloane v. United States,* 47

F.2d 889, 890 (10th Cir.1931) (evidence seized by state officers admissible because the state officers were not acting for the federal agents nor solely for the purpose of aiding in the enforcement of federal law). The common element in these cases is that where there was either active participation in the search by federal agents, or the state agents were acting solely for the benefit of the federal agents, the search was considered a federal search. Considering such holdings, then, in converse for consideration under the "reverse silver-platter" doctrine, in evaluating the relationship between the State and a federal agent, it would appear that a search made jointly with federal agents is actually a state search for purposes of the application of state constitutional standards if the state agents actively participate in the search or the federal agents were acting solely for the benefit of the state officers in conducting the search.

neither requested, directed, nor participated in the search in which Rivera spontaneously engaged.

On appeal, appellant does not challenge the search itself. His sole contention relates to his detention during which the search took place. Appellant does not claim that the search was not within the scope of a proper border search, but rather claims it was not a border search at all.[7] Appellant admits that customs agents may detain persons in a border search without reasonable suspicion. He asserts, however, that at the time of the search, he was not being detained by the Customs Office. Appellant argues that when Rivera took him to speak with DPS Trooper Garcia, the Customs agent was acting as an agent for the State of Texas and thus at that point he was no longer being detained by customs but by the State of Texas and so reasonable suspicion was needed to justify the detention. Appellant asserts that during the time that Garcia questioned him, and Rivera searched him, he was being illegally detained without reasonable suspicion, rendering his detention unjustified and the subsequent search, illegal.[8] Appellant therefore challenges the trial court's decision that the search was a routine customs inspection, alleging instead that he was actually being illegally detained by the State of Texas.

 If appellant was being detained by the State of Texas, the detention would only be justified if the detaining officer had specific articulable facts, which taken together with rational inferences from those facts, led him to conclude that appellant detained actually was, had been, or soon would be engaging in criminal activity. *Woods v. State*, 956 S.W.2d 33, 38 (Tex.Crim.App.1997). If appellant was being detained by the Customs agent pursuant to a border examination, no suspicion, reasonable or otherwise, was required. *Sandler*, 644 F.2d at 1165. The question before us, then, is whether appellant, at the time of the search, was still being detained by Customs agent Rivera pursuant to a customs border examination or whether he was being detained by DPS Trooper Garcia with Rivera acting merely as an agent for the State of Texas.

 A review of the evidence, giving deference to the trial court's factual findings and viewing the remaining facts in a light most favorable to the trial court's decision, indicates that appellant at all times remained in the custody of Agent Rivera who had done some initial questioning but had not yet completed his border examination of appellant. While Rivera escorted appellant to Trooper Garcia, he did not turn appellant over to Garcia but waited for Garcia to ask a few questions. Whether he was questioned by Garcia for twenty minutes as claimed by appellant or for thirty to forty-five seconds as claimed by Rivera, appellant remained always under the control and in the custody of Rivera. We do not find any illegal detention by Garcia.

 Nor do we find that Rivera acted solely as an agent for Garcia in an effort to circumvent appellant's constitu-

---

7. Before the trial court, appellant argued that the customs agent needed reasonable suspicion to conduct the search, claiming that it was a "more intensive search," in addition to challenging the alleged detention by DPS. Appellant does not renew that argument on appeal and so we do not address it. We note, however, that the search by a customs agent of a person's pockets has been held part of a

routine border search which requires no suspicion. *United States v. Sandler*, 644 F.2d 1163, 1169 (5th Cir.1981).

8. Appellant did not question, and the trial court did not reach, the issue of probable cause for the search if appellant was validly detained by the State and so we do not rule on that issue

tional rights as prohibited under *Toone.* Rivera had specific items, relative to his duties as a customs agent, for which he was searching. Rivera had begun his border search of appellant in relation to those items and had not yet completed it. Rivera became increasingly suspicious that appellant was carrying undeclared currency—one of the items for which Rivera was searching. Rivera's questioning of appellant, his growing suspicion after viewing appellant and feeling a bulge in appellant's pocket which might be currency, and Rivera's impulsive act of reaching into appellant's pocket after appellant appeared to be attempting to conceal something in that pocket were all pursuant to his duties as a Customs agent.[9] Garcia's questioning, and appellant's attempt to conceal the items in his left pocket as a result of that questioning, may have been the catalyst for Rivera to take action and spontaneously engage in the physical search but did not convert Rivera into an agent for the State of Texas. The detention and search were pursuant to Rivera's ongoing border search of appellant and, accordingly, Rivera needed no reasonable suspicion to detain appellant or probable cause to search him. *Sandler,* 644 F.2d at 1165, 1169.

### Conclusion

We overrule appellant's sole issue and affirm the judgment of conviction.

**9.** Although appellant does not directly challenge the search, we note that had there been any proof of Garcia directing Rivera to search or proof of a tacit or express understanding between the two for Rivera to search on Garcia's behalf, such evidence would be sufficient to establish that Rivera acted as an agent of the State. Under the facts of this case where Rivera clearly had federal objectives and duties which were still in process, "without some showing of a tacit or expressed understanding, difficult though it may be to find proof thereof," we cannot say that Rivera was engaged in an effort to aid Garcia to "do indirectly what the Fourth Amendment" did not allow Garcia to do directly so as to bring Rivera under the color of state law. *See Shurman v. United States,* 219 F.2d 282, 287 (5th Cir.1955).