**The STATE of Texas, Appellant,**

v.

**Evon KELLY, Appellee.**

**No. 13–04–114–CR.**

Court of Appeals of Texas, Corpus Christi–Edinburg.

June 30, 2005.

---

Carlos Valdez, Nueces County Dist. Atty., Lance A. Watt, Asst. Dist. Atty., Corpus Christi, for state.

Joseph V. Collina, John S. Gilmore, Jr., Gilmore & Granberry, Corpus Christi, for appellee.

Before Justices RODRIGUEZ, CASTILLO and GARZA.

## OPINION

Opinion by Justice CASTILLO.

The trial court granted appellee Evon Kelly's pretrial motion to suppress blood-alcohol test results from blood extracted for purposes of medical treatment. The State of Texas appeals from that ruling.[1] We reverse and remand.

## I. FACTS [2]

On or about March 5, 2001, Kelly was operating a motor vehicle on a public roadway. Her minor son was a passenger in the back seat of the vehicle. Kelly turned left after stopping at an intersection and collided with an oncoming vehicle. The child was ejected. Both Kelly and her son were transported for emergency medical treatment. The two occupants from the other vehicle were similarly transported for emergency treatment. At the emergency room, a phlebotomist drew blood for purposes of Kelly's medical treatment. Police officers contacted Kelly at the hospital and smelled a strong odor of alcohol. When police officers requested a blood specimen, she refused. Pursuant to a grand jury subpoena, the blood test results were secured. The results showed a blood-alcohol concentration above the legal limit of .08.[3] The State subsequently charged Kelly with the offense of driving while intoxicated.

Our review of the record shows that the State filed a rule 902(10) notice of its intent to offer business records by affidavit. *See* TEX.R. EVID. 910(10). A certified copy of Kelly's hospital records are attached to the motion. Kelly responded by filing a motion to suppress evidence of the blood test results, asserting as grounds that the blood was drawn without her effective and informed consent. The trial court convened an evidentiary hearing on Kelly's motion to suppress. Kelly and the hospital employee who extracted the blood, Don Gosson, testified. Kelly denied she consented to the extraction of her blood, admitted she consented, and then denied consent. Gosson testified that Kelly consented and, had she not consented, he would not have drawn blood. The trial court requested additional briefing. The parties complied. The trial court granted the motion to suppress, thus, ruling the evidence inadmissible at trial. This appeal ensued.

## II. STANDARD OF REVIEW

■ A motion to suppress is a specialized objection to the admissibility of evidence. *Morrison v. State*, 71 S.W.3d 821, 826 (Tex.App.-Corpus Christi 2002, no pet.) (citing *Galitz v. State*, 617 S.W.2d 949, 952 n. 10 (Tex.Crim.App.1981) (op. on reh'g) (en banc)). Kelly espouses the well-settled bifurcated standard of review in *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim.App.1997) (en banc). *Guzman* instructs that the relevant standard of review depends on the type of question presented. *Id.; Pena v. State*, 61 S.W.3d 745, 752 (Tex.App.-Corpus Christi 2001, no pet.). We afford almost total deference to the trial judge's determination of questions of historical facts supported by the record, especially those facts based on an evaluation of credibility and demeanor. *Pena*, 61 S.W.3d at 752. We apply the same stan-

---

1. *See* TEX.CODE CRIM. PROC. ANN. art. 44.01(a)(5) (Vernon Supp.2004–05); TEX.R.APP. P. 25.2(a).

2. Kelly agrees with the State's recitation of the historical facts but emphasizes facts relevant to her consent theory. *See* TEX.R.APP. P. 38.1(f) & 38.2(a)(1)(B).

3. *See* TEX PEN.CODE ANN. § 49.01(2)(B) (Vernon 2003) (" 'Intoxicated' means having an alcohol concentration of 0.08 or more.").

dard when reviewing the trial judge's rulings on "application of law to fact questions," also known as "mixed questions of law and fact," where the resolution of those ultimate questions turns on an evaluation of credibility and demeanor. *Id.* When considering "mixed questions of law and fact" which do not turn on an evaluation of credibility and demeanor, de novo review is appropriate because the trial judge is not in an appreciably better position than the appellate court to decide the issue. *Id.* Most reviews of motion to suppress cases will be under a bifurcated standard, in which the historical determination made by the trial court will be accorded total deference while the application of the law to the facts will be analyzed under a de novo standard of review. *State v. Ross*, 32 S.W.3d 853, 856 (Tex.Crim.App. 2000) (en banc).

■ In the absence of explicit fact findings, we assume that the trial court's ruling is based on implicit fact findings supported in the record. *See Carmouche v. State*, 10 S.W.3d 323, 332 (Tex.Crim.App. 2000) (recognizing implicit fact findings); *Ross*, 32 S.W.3d at 855; *Perales v. State*, 117 S.W.3d 434, 437 (Tex.App.-Corpus Christi 2003, pet. ref'd). We then review de novo whether the facts, express or implied, are sufficient to provide legal justification for admitting the complained-of evidence. *See Morrison*, 71 S.W.3d at 827 (citing *Garcia v. State*, 43 S.W.3d 527, 530 (Tex.Crim.App.2001)).

■ We uphold a trial court's ruling on a suppression motion if it is reasonably supported by the record and is correct on any theory of law applicable to the case.

*Villarreal v. State*, 935 S.W.2d 134, 138 (Tex.Crim.App.1996) (en banc); *Perales*, 117 S.W.3d at 438. This is true even if the decision is correct for reasons different from those espoused by the trial court. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim.App.1990) (en banc).

### III. DISCUSSION

By one issue, the State asserts that the trial court abused its discretion in suppressing blood-alcohol test results. The State obtained the results pursuant to a grand jury subpoena of Kelly's medical records after a traffic accident. The State maintains there is no reasonable expectation of privacy as to the results. Kelly counters that the trial court properly suppressed the evidence because the results were obtained without a valid search warrant, a court order, or Kelly's effective consent.

■ We address first Kelly's contentions that the results are properly excluded in the absence of a valid search warrant and a court order. Generally speaking, taking a blood sample is a search and seizure within the scope of the Fourth Amendment to the United States Constitution and article I, section 9 of the Texas Constitution. *Schmerber v. California*, 384 U.S. 757, 767, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *Aliff v. State*, 627 S.W.2d 166, 169 (Tex.Crim.App.1982). Kelly based her complaint on the three following grounds: (1) the initial blood draw was performed in violation of the law because she did not consent;[4] (2) she was assaulted; and (3) the results were illegally disclosed to law enforcement officers.[5]

4. Kelly relies on *Hailey v. State*, 50 S.W.3d 636, 640 (Tex.App.-Waco 2001), *rev'd on other grounds*, 87 S.W.3d 118 (Tex.Crim.App.2002), *cert. denied*, 538 U.S. 1060, 123 S.Ct. 2218, 155 L.Ed.2d 1111 (2003) (holding that the results of a blood test taken by a hospital employee without the defendant's permission should have been suppressed under article 38.23 because taking the specimen was an assault).

5. Kelly does not discuss the third theory on appeal. Even so, the testimony at the hearing

Because the blood extraction did not involve police conduct, the Fourth Amendment search and seizure principles were not implicated.[6] *See Clark v. State,* 933 S.W.2d 332, 333 (Tex.App.-Corpus Christi 1996, no pet.); *see also St. Clair v. State,* 26 S.W.3d 89, 102 (Tex.App.-Waco 2000, pet. ref'd); *State v. Hurd,* 865 S.W.2d 605, 606–07 (Tex.App.-Fort Worth 1993, no pet.); *Weaver v. State,* 721 S.W.2d 495, 498 (Tex.App.-Houston [1st Dist.] 1986, pet. ref'd).

Similarly, the absence of consent for emergency care is not required if a court of record orders the treatment of an individual who is in an imminent emergency to prevent the individual's serious bodily injury or loss of life. Tex. Health & Safety Code Ann. § 773.008(2) (Vernon 2003). Kelly did not assert to the trial court this theory in support of her motion to suppress. We do not address it on appeal. *See Hailey v. State,* 87 S.W.3d 118, 120–22 (Tex.Crim.App.2002). Accordingly, in the context of the sole issue before us, we conclude that the absence of a search warrant or a court order are not theories of

law applicable to the case before us. *See Villarreal,* 935 S.W.2d at 138.

■ Illegally obtained evidence, whether procured by private individuals or by police officers, is strictly inadmissible in Texas criminal proceedings under article 38.23. *See* Tex.Code Crim. Proc. Ann. art. 38.23(a) (Vernon 2005).[7] The article applies to private citizens. *State v. Johnson,* 939 S.W.2d 586, 587–88 (Tex.Crim.App. 1996) (en banc). Thus, if Kelly's blood was taken in violation of any state or federal law or constitutional provision, not only the blood but also the results of the blood test would be properly suppressed. *See id.* at 588; *Johnson v. State,* 871 S.W.2d 744, 750 (Tex.Crim.App.1994); *Bell v. State,* 724 S.W.2d 780, 787 (Tex.Crim.App.1986). We turn to the opposing theories the parties presented to the trial court: (1) no reasonable expectation of privacy, and (2) lack of consent. *See Hailey,* 87 S.W.3d at 120–22. While the evidence in the present case was disputed, we conclude that the issue to be decided did not turn on credibility or demeanor. Accordingly, we will grant almost complete deference to the trial

---

does not support the theory. The supplemental police report attached to Kelly's trial court brief as an "exhibit" is not evidence. An exhibit not expressly admitted into evidence may be considered as evidence when the parties and judge treat the exhibit as if it were in evidence. *See Heberling v. State,* 834 S.W.2d 350, 355–56 (Tex.Crim.App.1992) (en banc). There is no showing that the trial court treated the supplemental police report as if it were evidence. Nonetheless, the supplemental police report is not properly authenticated. Tex.R. Evid. 901(a), 902(4),(10).

**6.** The consent statutes of the Texas Transportation Code do not apply here. The implied consent and refusal to consent statutes of the transportation code apply only when a person is arrested. For example, a person is deemed to have consented to the taking of a breath or blood specimen only if he is arrested for an offense committed while operating a motor

vehicle while intoxicated. *See* Tex. Trans. Code Ann. § 724.011 (Vernon 2003); *Combest v. State,* 981 S.W.2d 958, 960 (Tex.App.-Austin 1998, pet. ref'd). Here, Kelly was not arrested prior to her blood extraction. Because the implied consent statutes do not apply, we do not determine whether the State proved by clear and convincing evidence that Kelly voluntarily consented to the taking of her blood, as Kelly asserts. *See Combest,* 981 S.W.2d at 961.

**7.** Article 38.23(a) states:

No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

Tex.Code Crim. Proc. Ann. art. 38.23 (Vernon 2005).

court's finding of the historical facts and review de novo the application of the law to the facts. *Pena,* 61 S.W.3d at 752.

### A. No Reasonable Expectation of Privacy

As the State correctly asserts, the Court of Criminal Appeals has held that an accused does not have a legitimate expectation of privacy in medical records containing blood-alcohol test results "taken by hospital personnel solely for medical purposes after a traffic accident." *State v. Hardy,* 963 S.W.2d 516, 527 (Tex.Crim. App.1998). The State argues, that the evidence of Kelly's blood-alcohol concentration contained in the medical record was duly obtained pursuant to a grand jury subpoena. Thus, says the State, the record is admissible.

▇▇▇ The parties do not dispute that Kelly's blood was drawn solely for medical purposes. Our review of the record reaches the same conclusion. Accordingly, we conclude that Kelly does not have a legitimate expectation of privacy in her blood-alcohol test results. *Hardy,* 963 S.W.2d at 527; *Clark,* 933 S.W.2d at 333. Because the Fourth Amendment does not confer a reasonable expectation of privacy under these circumstances, Kelly has no grounds to complain of an unreasonable search or seizure under the Fourth Amendment. *See Weaver,* 721 S.W.2d at 498; *see also Spebar v. State,* 121 S.W.3d 61, 65 (Tex. App.-San Antonio 2003, no pet.) (holding that constitutional error is not implicated where the record does not establish hospital personnel were acting as state agents for law enforcement purposes when the blood was drawn and analyzed). Kelly has not challenged the grand-jury subpoena

process.[8] *See Garcia v. State,* 95 S.W.3d 522, 526–27 (Tex.App.-Houston [1st Dist.] 2002, no pet.); *Dickerson v. State,* 965 S.W.2d 30, 31 (Tex.App.-Houston [1st Dist.] 1998, pet. dism'd, improvidently granted). We conclude that the medical record, including the blood-test results, would be admissible under the theory that Kelly has no expectation of privacy under *Hardy.*[9] However, our inquiry does not end here. Kelly complains that the tests results were rendered inadmissible under article 38.23(a) of the code of criminal procedure because the blood was illegally obtained by a person (not an officer) in violation of the following laws of the State: (1) the Texas Penal Code, governing assault; and (2) the Texas Health and Safety Code, governing consent for medical treatment. Thus, we must consider admissibility under article 38.23(a). *See* TEX.CODE CRIM. PROC. ANN. art. 38.23 (Vernon 2005).

### B. Lack of Consent

Essentially, Kelly asserts that the absence of her "effective consent" is fatal to the admissibility of the test results. She asserts that her blood was drawn in violation of the law and, thus, the test results were properly suppressed as inadmissible under article 38.23. *Id.* We turn to the testimony adduced at the motion to suppress hearing.

#### 1. The Record

Two witnesses testified at the hearing-Kelly and the phlebotomist who drew the blood. Kelly testified first on direct examination:

Q: Did they ever ask you for consent to do that [draw blood]?

---

8. *See* TEX. OCC.CODE ANN. § 159.003(a)(10), (12) (Vernon 2004).

9. Thus, the trial court could have properly denied the motion to suppress on grounds of admissibility under rule 910(10). TEX.R. EVID. 910(10); *see* TEX.R. EVID. 803(6), (7).

A: Not that I recall, no.

Q: When they drew the sample, were you conscious?

A: Yes, I was.

Q: Were you aware of your circumstances?

A: Yes.

Q: Were you able to answer questions of people who were treating you?

A: Yes.

Q: Do you recall—any person asking you whether or not you gave consent or approval for the blood draw?

A: No, I do not.

Q: Okay. And did you consent to the blood draw?

A: No.

Q: Were you ever presented a—any documentation so that you could consent?

A: No.

Q: You were given documentation to consent to a surgical procedure that happened sometime later at your stay at the hospital, is that correct?

A: Yes.

Q: Do you remember the blood draw?

A: Yes, I do.

Q: Did it hurt you?

A: Yes.

Q: Okay. Caused you physical pain?

A: Yes.

Q: Did you ever give your husband consent—permission to consent to medical treatment for you? [10]

A: No.

Q: And, in particular, the blood draw?

A: No.

On cross-examination by the prosecutor, Kelly testified as follows:

Q: Mrs. Kelly, did you ever object to any treatment you had received that day?

A: No.

Q: Was your husband present in the room with you that day?

A: For part of the time, yes.

Q: Okay. Was he present when they drew the blood?

A: I do not believe so.

Q: But he could have been present, is that correct?

A: That's true. . . .

Q: Do you know the time that your husband was present in your hospital room with you did—at any time did you hear your husband object to any treatment that was being provided by the personnel at Spohn?

A: No.

Q: How many times did they draw your blood, if you recall?

A: I do not recall that.

Q: Could it have been more than once?

A: I believe it was only one time.

Q: Are you claiming then that you were assaulted by someone because you did not give consent?

A: Yes. . . .

Q: Was it a male or a female who took the blood from you, ma'am?

---

**10.** Although Kelly said she did not give her husband permission to sign the hospital consent form on her behalf, she offered no evidence to explain why her husband signed the form. *See Spebar v. State,* 121 S.W.3d 61, 64 (Tex.App.-San Antonio 2003, no pet.). We observe that the presumed signature of her husband appears on the consent form, above the notation "PATIENT, MINOR GUARDIAN OR LEGAL REPRESENTATIVE." The Texas Health and Safety Code authorizes a spouse to consent to medical treatment if the patient-spouse is comatose, incapacitated, or otherwise mentally or physically incapable of communication. *See* TEX. HEALTH & SAFETY CODE ANN. § 313.004(a)(1) (Vernon 2001).

A: I do not really recall. There were several people around me at that time.

Don Gosson, the emergency room technician/phlebotomist, testified that, on May 5, 2001, one of his duties was to draw blood. On that day, Kelly was "in a trauma situation . . . she had a C-collar on her, and she was on a back board, and she was restrained, so she was given priority." He testified that Kelly was conscious and able to talk to him. He received orders to draw blood on meditech. He further testified:

Q: As far as meditech, can you explain what meditech is?

A: It's just a series of medical orders or medical blood draw requests that come in. It's like—it's a series of orders that comes out that we use to obtain the type of blood draw that is requested.

Q: That's used at the . . . direction of the hospital?

A: Correct.

Q: And it's in no way related to the police department . . . or their investigation?

A: No.

He testified that a police officer did not tell him to draw the blood. He testified he asked Kelly for her consent to draw blood:

Q: Did you obtain that consent?

A: I obtained her consent.

Q: She didn't tell you, "No, you can't have my blood?"

A: I wouldn't have drew it. . . . She didn't tell me no.

Q: If she had told you you can't draw her blood you indicated you wouldn't have done it. What would you have done after that?

A: If she had stated that I could not obtain her blood from her I would have told her that's okay. I wouldn't have drew her blood. I would have left. I

would have reported that to the nurse and, you know, that's all I can do.

Q: But in this case she didn't tell you?

A: No, I wouldn't have drew her blood.

On cross-examination, Gosson testified:

Q: And that's what she did in this case, was she acquiesced to what you told her you were there to do?

A: Correct.

Q: And you went in, you told her, "I'm here to draw your blood" and you put the band on her arm and she didn't fight, right?

A: Correct.

Q: She didn't struggle with you?

A: No.

Q: She didn't yank her arm back and say, "No you can't do that?"

A: No sir. . . .

Q: Okay. Do you have any knowledge whether or not she signed a consent to treat?

A: I don't.

Q: Okay. And that's not your primary concern when you're in there. You're not worried about whether she consents. In fact, you presume that if she is there she is consenting to the treatment of the hospital, isn't that correct?

A: Well, only if she gives me permission. . . .

Q: And you're interpreting that lack of refusal to be consent?

A: Yes, sir.

Questioning of Gosson by the prosecutor continued as follows:

Q: You said that she was aware of her surroundings?

A: I didn't ask her for person, place, or time. I didn't try to establish her conscious level, but she was conscious enough to give consent. . . .

Q: Do you wait until the consent to treat form is signed before you proceed

with any kind of emergency medical treatment for the patient?

A: No, sir.

Q: Okay. Do you generally receive consent orally?

A: If the patient is conscious and awake and alert then we can ask the patient, "Is it okay if we draw some blood?"

Q: Was she conscious, awake, and alert?

A: Yes, sir.

The defense re-called Kelly. She denied that Gosson asked permission to draw blood. She further testified:

Q: As a matter of fact, when somebody gave you the choices as to whether or not you would allow a blood draw or not you refused, is that correct?

A: Yes, I did.

Q: And that came when the police officer after this blood draw came and told you that ... they wanted a blood draw and that you had a right to either consent or refuse, is that right?

A: That's right.

Q: And at that point once you were given a choice you refused, is that correct?

A: Yes, I did.

In turn, the State focused its re-cross-examination on grounds of self-serving testimony, and Kelly testified:

Q: It's in your case's best interests to say today that you didn't give consent, is that correct?

A: No.

Q: Okay. You understood ... officers came in and asked you whether or not they could take a blood sample from you, is that correct?

A: Yes, they did.

Q: And they read to you what's called the DIC–24. Do you remember them reading a form to you—

A: I do remember.

Q: And in that particular case you did refuse?

A: Yes, I did.

Q: But you're saying you didn't understand what the gentleman here, Mr. Gosson, was explaining to you with respect to the blood draw?

A: He didn't explain anything to me.

Q: What is your recollection of what happened when he walked into the room?

A: My recollection is he said, "I'm here to take your blood." And ... there were people doing all kinds of things. I was horizontal.

Q: ... And when he says, "I'm here to take your blood," did you say to Mr. Gosson "Not a chance?"

A: No, I did not.

Q: Did you tell him under no circumstances did you want him to draw any blood from you?

A: No, I did not.

Q: And what's the next thing that he said to you?

A: I really don't recall.

Q: Okay. And at the time did you think it would be in your best medical interests to have the blood drawn so you could be treated by the medical staff?

A: That was what needed to be done....

Q: Now, you knew that they needed to draw blood to adequately treat you medically, is that correct?

A: I did not know that. I was just told that the blood was going to be drawn from me.

Q: And you consented by not refusing because you knew that was part of your medical treatment, is that correct?

A: I consented.

Q: You did consent?

A: Well, I put my arm out.

On further questioning by defense counsel, Kelly subsequently denied she consented. The defense argued that Kelly did not consent to the blood draw, the blood draw was an assault, and should not be admitted under article 38.23 of the code of criminal procedure.

### 2. Disposition

#### Assault

■ Kelly asserts that because she did not consent to the blood extraction, she was assaulted.[11] Section 22.01(a)(1) of the penal code states that a person commits an assault if he "intentionally, knowingly, or recklessly causes bodily injury to another." TEX. PEN.CODE ANN. § 22.01(a)(1) (Vernon 2003). The victim's effective consent or the actor's reasonable belief that the victim consented to the actor's conduct is a defense to an assault prosecution if (1) the conduct did not threaten or inflict serious bodily injury under section 22.06(1); and (2) the victim knew the conduct was a risk of recognized medical treatment, under section 22.06(2)(B). *See* TEX. PEN.CODE ANN. § 22.06(1), (2)(B) (Vernon 2003). We observe that the provisions of the penal code must be construed according to the fair import of their terms, to promote justice and effect the objectives of the code.

TEX. PEN.CODE ANN. § 1.05(a) (Vernon 2003).

■ When the trial court does not make explicit findings of historical facts, we review the evidence in the light most favorable to the trial court's ruling. *Morrison*, 71 S.W.3d at 827 (citing *Walter v. State*, 28 S.W.3d 538, 540 (Tex.Crim.App. 2000)). Viewed in the light most favorable to the trial court's ruling, the evidence negates assault. Even assuming that Kelly did not consent, Gosson would not have drawn blood if Kelly had not consented. Thus, he possessed a reasonable belief that she consented. Further, the extraction of blood neither threatened nor inflicted serious bodily injury.[12] Accordingly, exclusion of the evidence on grounds of assault is not supported in the record. *See Ramos v. State*, 124 S.W.3d 326, 336 (Tex.App.-Fort Worth 2003, pet. ref'd). Thus, the test results were not inadmissible under article 38.23.

#### Effective Consent

■ Kelly asserts that blood was drawn in violation of section 773.008 of the Texas Health and Safety Code which states:

Consent for emergency care of an individual is not required if:

(1) the individual is:

(A) unable to communicate because of an injury, accident or illness or is unconscious; and

---

11. Kelly did not raise civil assault to the trial court. Thus, we will not address the theory. *See Hailey v. State*, 87 S.W.3d 118, 120–22 (Tex.Crim.App.2002); *see also Knapp v. State*, 942 S.W.2d 176, 179–80 (Tex.App.-Beaumont 1997, pet. ref'd) (discussing various theories that alleged evidence sought to be suppressed was rendered inadmissible under article 38.23).

12. " 'Serious bodily injury' means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." TEX. PEN.CODE ANN. § 1.07(46) (Vernon 2003).

(B) suffering from what reasonably appears to be a life-threatening injury or illness. . . .

TEX. HEALTH & SAFETY CODE ANN. § 773.008 (Vernon 2003).

 Viewed in the light most favorable to the trial court's ruling, the evidence shows that Kelly was "conscious and able to communicate" as she asserts. The evidence reasonably infers that she could have signed a written consent for treatment. Even so, the evidence also establishes that she unequivocally admitted, under oath, that she consented to the extraction of blood. Oral consent is sufficient. *See, e.g., Jackson v. State*, 968 S.W.2d 495, 499 (Tex.App.-Texarkana 1998, pet. ref'd). Further, the objective physical manifestation of Kelly's consent is established by the admitted extension of her arm to allow the extraction of the blood. Kelly allowed multiple procedures on her person, including bracing her body for transport and the transportation for the sole purpose of emergency medical care. Indeed, these are not manifestations of a "mere acquiescence of authority." The blood extraction was solely for medical purposes. Consent for the blood sample reasonably contemplates the use of the blood in furtherance of her emergency medical diagnosis and treatment. To isolate the blood extraction, admittedly done in furtherance of her medical treatment, and attest in hindsight that it was the sole act she did not consent to belies the evidence in the case. "It is axiomatic that if there was consent to or a request for treatment, any complaint by [the defendant] that blood was taken illegally would be negated." *Hailey v. State*, 50 S.W.3d 636, 640 (Tex.App.-Waco 2001), *rev'd on other grounds*, 87 S.W.3d 118 (Tex.Crim. App.2002), *cert. denied*, 538 U.S. 1060, 123 S.Ct. 2218, 155 L.Ed.2d 1111 (2003). We conclude that the evidence establishes that Kelly consented to the blood extraction, despite her inconsistent testimony to the contrary. Accordingly, we conclude that Kelly's theory that the alcohol-blood test results are inadmissible under article 38.23, because she did not consent to the blood extraction for medical purposes, is not reasonably supported by the record. We cannot uphold a trial court's ruling on a suppression motion if it is not reasonably supported by the record and is not correct on any theory of law applicable to the case. *See Villarreal*, 935 S.W.2d at 138; *Perales*, 117 S.W.3d at 438.

## IV. CONCLUSION

We have focused our review on the sole issue presented: whether the trial court abused its discretion by suppressing the test results under the theory that there is no reasonable expectation of privacy in medical records showing blood-alcohol test results from tests taken by hospital personnel for medical purposes after a traffic accident. Our analysis leads us to one result: on this record, the ruling to suppress the test results is not supportable on the theories Kelly has espoused. Because the State's theory finds support in *Hardy*, 963 S.W.2d at 527, and *Clark*, 933 S.W.2d at 333, we sustain the State's sole issue. We reverse the order granting the motion to suppress and remand.