

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-14-00207-CR

KARL PATRICK HOULDITCH, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 71st District Court
Harrison County, Texas
Trial Court No. 13-0263X

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Chief Justice Morriss

## MEMORANDUM OPINION

Working under the direction of a federal task force called the North Texas Internet Crimes Against Children Task Force, Kevin Brownlee, a Longview Police Department detective, developed the initial lead and did the primary investigation leading to the issuance of a federal warrant to search for child pornography[1] at a Longview residence occupied by Karl Patrick Houlditch and two others. The ensuing search led to the discovery of a significant quantity of the material on a computer at that address and, ultimately, to Houlditch's convictions of thirty counts of possessing child pornography and his sentences of eight years on each conviction, ordered to run consecutively,[2] a total sentence of 240 years' imprisonment.

On appeal, Houlditch claims error in (a) the admission of the evidence of pornography on the basis of alleged staleness of the information on which the warrant was issued and on the basis of the "reverse-silver-platter" doctrine, (b) the admission of his statements made to officers during an interview in a patrol car, and (c) the trial court's order cumulating Houlditch's sentence into what is effectively a life term. We affirm the judgment of the trial court because (1) notwithstanding the staleness argument, the affidavit supporting issuance of the warrant sufficiently establishes probable cause for the search; (2) notwithstanding the reverse-silver-platter argument, the federal warrant validly supports use of the evidence; (3) Houlditch did not preserve

---

[1]*See* TEX. PENAL CODE ANN. § 43.26 (West Supp. 2014).

[2]*See* TEX. PENAL CODE ANN. § 3.03(b)(3) (West Supp. 2014).

for appeal any complaint concerning admission of his statements in evidence; and (4) Houlditch's sentence is not constitutionally infirm.[3]

*(1)    Notwithstanding the Staleness Argument, the Affidavit Supporting Issuance of the Warrant Sufficiently Establishes Probable Cause for the Search*

Houlditch complains first that the information in the affidavit supporting the search warrant was stale. As Houlditch points out, while the affidavit alleges that images of child pornography had been located on a particular computer between March 16 and April 24, 2013, the warrant was not issued until May 14, 2013, and not executed until May 24, 2013. Special Agent Michael Dawson of the United States Secret Service signed the affidavit and made the application for the search warrant to the magistrate of the United States District Court for the Eastern District of Texas. Dawson directed the Task Force, which investigated and prosecuted possessors of child pornography and which included both state and federal law enforcement officers, one of whom was Brownlee.

Dawson's affidavit included summaries of what Brownlee learned in his investigation. According to the affidavit, Brownlee used a database maintained and monitored by law enforcement[4] to discover images of child pornography being offered for sharing from a particular

---

[3]*See* U.S. CONST. art. VIII.

[4]The database

> Child Protection Systems (CPS) is a law enforcement maintained database utilized by federal and state law enforcement agencies in child exploitation investigations nationwide. . . . CPS maintains a log of IP addresses that have been previously involved in the possession and distribution of child pornography, as well as a hash value database that can be used to verify and confirm known files of child pornography.

Hash value refers to "a mathematical function which converts the data which comprises the contents of a file into an alpha-numeric value, giving that file a unique identity." In his affidavit, Dawson said he knew "through the computer

3

Internet Protocol (IP) address. The affidavit stated that Brownlee was experienced in using the CPS database in investigating child pornography and was familiar with internet networks, file sharing, and how the "hash values" of the files provided unique identifying information for each file. Brownlee observed that, between March 16 and April 24, 2013, the computer at the IP address at issue offered for download "124 known files of child pornography."[5]

Brownlee determined that the IP address with the pornographic images of children was registered with SBC/AT&T. Once Brownlee served a subpoena on that company, the company provided information that, on the March to April dates above, that IP address was registered to Houlditch's mother at a particular street address in Longview, which Brownlee learned was the residence of Houlditch, Houlditch's mother, and an additional male.

The affidavit also said,

> Collectors of child pornography almost always possess and maintain their "hard copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Child pornography collectors typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

(Footnote omitted).

---

forensic community that there has never been a documented occurrence of two different files being found on the Internet having different contents while sharing the same hash value."

[5]Houlditch argues that, because the IP address involved was dynamic, not static, it could not be said with certainty that the IP address on which the offensive images were located was an IP address used by Houlditch's computer on those dates. But the difference between dynamic and static IP addresses was not discussed in the affidavit and was not brought up until the suppression hearing. The affidavit made a clear case that the images were broadcast or offered for sharing on that particular IP address, which on the dates the pornographic images were located on that IP address, the IP address was issued to the account at Houlditch's residence in his mother's name.

Additionally,

> [c]omputer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years.

Also,

> collectors of child pornography often maintain their collections that are in a digital or electronic format in a safe, secure[,] and private environment, such as a computer and surrounding area. These collections are often maintained for several years and are kept close by, usually at the collector's residence, to enable the collector to view the collections, which is valued highly.

There is no specific expiration date for the timeliness of matters attested to in an affidavit for search warrant.[6] The affidavit is to be read with a common sense approach, gauged by "the reasonableness of the magistrate's conclusions based on facts and inferences . . . ." *State v. McLain*, 337 S.W.3d 268, 272 (Tex. Crim. App. 2011). "Probable cause exists if, under the totality of the circumstances, there is fair probability that contraband or evidence of a crime will be found at a specified location. It is a flexible, non-demanding standard." *State v. Le*, 463 S.W.3d 872, 878 (Tex. Crim. App. 2015) (citation omitted). All that is required is that the information in the affidavit not be stale: "the facts contained in the affidavit must have occurred recently enough to allow the magistrate to conclude that probable cause exists at the time that the warrant is requested and ultimately issued." *Kennedy v. State*, 338 S.W.3d 84, 93 (Tex. App.—Austin 2011, no pet.).

> Probable cause has an important time element. Probable cause ceases to exist when it is no longer reasonable to presume that items once located in a specified place are still there. Conversely, it may be reasonable under all the circumstances to

---

[6]Part of Houlditch's argument is that the warrant was executed more than three days after its issuance and that this circumstance contravenes the requirement of Article 18.06 of the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 18.06 (West 2015). Search warrants issued by a federal magistrate are not subject to the requirements of Article 18.01; thus, they would not be subject to the requirements of Article 18.06 either. TEX. CODE CRIM. PROC. ANN. 18.01 (West 2015); see *Toone v. State*, 872 S.W.2d 750, 752 (Tex. Crim. App. 1994).

5

presume that they are still where they once were, even after a considerable lapse of time. Among the factors that may be considered when evaluating the reasonableness of a magistrate's inference that the suspect property is likely to be found where it was last seen are the length of time elapsed, the nature of the property, the nature of the criminal activity, and the likelihood that the contraband might be moved.

*State v. Bradley*, 966 S.W.2d 871, 875 (Tex. App.—Austin 1998, no pet.) (although affidavit did not say when confidential informant saw drugs in defendant's home, "common-sense and realistic" reading gave magistrate "substantial basis" to conclude residence was being used to sell cocaine and contraband would be found at time warrant issued).

"The proper method to determine whether the facts supporting a search warrant have become stale is to examine, in light of the type of criminal activity involved, the time elapsing between the occurrence of the events set out in the affidavit and the time the search warrant was issued." *Morris v. State*, 62 S.W.3d 817, 823 (Tex. App.—Waco 2001, no pet.). In *Morris*, the informant witness had seen pornographic images of children on the defendant's computer one month before the search warrant issued. But the affidavit also had information that the defendant had been in possession of child pornography over several months before the affidavit was signed. These facts allowed a reasonable inference that Morris was in possession of child pornography a "substantial period of time," which made the "passage of time between the last time [the witness] saw Morris in possession of child pornography (near the end of February 2000) and the issuance of the warrant (April 7, 2000) less significant." *Id.* at 824.

Here, the affidavit established how Brownlee had concluded that child pornography was present on a computer at the residence where Houlditch lived, noting that collectors of child pornography were likely to maintain their files for long periods of time in their homes. Based on

6

this information, we cannot say that the information in the affidavit was stale or that the trial court abused its discretion in denying suppression in the face of the staleness argument. We overrule this point of error.

*(2)* *Notwithstanding the Reverse-Silver-Platter Argument, the Federal Warrant Validly Supports Use of the Evidence*

Though the search warrant in this case was issued by a federal magistrate and this case was initially intended to be prosecuted in a federal court, when Houlditch's family members told investigators that Houlditch planned to kill himself, the decision was made to file the case in state court. Brownlee testified that the decision to switch jurisdictions was influenced by the expectation that getting an arrest warrant issued by a Texas court would be much quicker and simpler than by a federal court. Thus, the evidence acquired via the authority of the federal search warrant was provided to the State of Texas for use in its prosecution. This situation has triggered analysis using the reverse-silver-platter doctrine. Some background exposition is helpful.

"We do not question the right of the federal government to avail itself of evidence improperly seized by state officers operating entirely on their own account. But the rule is otherwise when the federal government itself, through its agents acting as such, participates in the wrongful search and seizure." *Byars v. United States*, 273 U.S. 28, 33 (1927). This was in keeping with the Fourth Amendment's "plain spirit and purpose of the constitutional prohibitions intended to secure the people against unauthorized official action." *Id*. In *Byars*, a federal agent was invited to execute a search warrant secured by Iowa police. The police were searching for illegal alcoholic beverages; the federal prohibition officer was "asked to participate and did participate as a federal enforcement officer, on the chance, which was subsequently realized, that something would be

disclosed of official interest to him as such agent." *Id.* at 32. The local police search warrant was "clearly . . . bad if tested by the Fourth Amendment and the laws of the United States." *Id*. at 29. After concluding that the federal agent was operating in his capacity as a federal law enforcement officer, the Court made the above statement and continued with an elaboration:

> The Fourth Amendment was adopted in view of long misuse of power in the matter of searches and seizures both in England and the colonies; and the assurance against any revival of it, so carefully embodied in the fundamental law, is not to be impaired by judicial sanction of equivocal methods, which, regarded superficially, may seem to escape the challenge of illegality but which, in reality, strike at the substance of the constitutional right.

*Id.* at 33–34. The Court's reversal, finding suppression should have been granted, then seems to turn on the federal agent's participation in an illegal search and seizure.

*Byars*' doctrine was applied by the Court later in *Lustig v. United States*, 338 U.S. 74 (1949). A Secret Service agent was alerted by local New Jersey police and a hotel representative that counterfeiting might be occurring in one of the hotel rooms. *Id.* at 75. The agent went to the hotel room and looked through the keyhole, but saw no evidence of counterfeiting. A maid told him she had heard noises "like glass hitting against glass or metal hitting against metal" coming from the room and that she saw "what looked like money on the table." *Id*. at 76. The agent then told a local detective that, while the agent had seen no evidence of counterfeiting, he "was confident that 'something was going on.'" *Id*. Without securing a search warrant,[7] the local police obtained a key from the hotel manager and searched the room, looking for evidence of counterfeit

---

[7]Lustig and his partner were registered under assumed names; one of those assumed names belonged to a "racehorse man or a tout or a bookie," according to a police sergeant. *Lustig*, 338 U.S. at 76. Thinking racetrack tickets might be being counterfeited, police got arrest warrants for the two occupants. The warrants were based on a local ordinance "requiring 'known criminals' to register with the local police within twenty-four hours after their arrival in town." *Id*.

racetrack tickets. The Secret Service agent stayed back at the police station, "curious to see" what the local police would discover. When the police found evidence of currency counterfeiting, they sent word to the Secret Service agent, who then went to the hotel. The agent took possession of the counterfeiting evidence. *Id.* at 77.

The United States Supreme Court deferred to the trial court's ruling on factual issues; so the Court accepted the trial court's admission of the evidence "because he did not 'see any connivance or arrangement on the part of the Federal officers to have an illegal search made to get evidence they could not secure under the Federal law." *Id.* at 77–78. But the Secret Service agent nonetheless clearly participated in what the Court called an "illegal search." *Id*. at 78. While the federal agent did not initiate the search, he attended it and "share[d] in the critical examination of the uncovered articles as the physical search proceeded." *Id*. There was no point parsing whether the agent participated in the illegal search from its inception or joined in before its conclusion; to do so "would be to draw too fine a line in the application of the prohibition of the Fourth Amendment as interpreted in *Byars v. United States . . . .*" *Id*.

Here seems to be where we get the title "silver-platter doctrine." The *Lustig* Court summarized *Byars*:

> The crux of [the *Byars*] doctrine is that a search is a search by a federal official if he had a hand in it; it is not a search by a federal official if evidence secured by state authorities is turned over to the federal authorities on a silver platter. The decisive factor in determining the applicability of the *Byars* case is the actuality of a share by a federal official in the total enterprise of securing and selecting evidence by other than sanctioned means. It is immaterial whether a federal agent originated the idea or joined in it while the search was in progress. So long as he was in it before the object of the search was completely accomplished, he must be deemed to have participated in it. Where there is participation on the part of federal officers it is not necessary to consider what would be the result if the search had been

9

conducted entirely by State officers. Evidence secured through such federal participation is inadmissible for the same considerations as those which made *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, L.R.A.1915B, 834, Ann.Cas. 1915C, 1177, the governing principle in federal prosecutions.

*Id.* at 78–79. *Lustig* and *Byars* seem to acknowledge the propriety of delivering evidence by state law enforcement to federal law enforcement, but where the evidence was gathered illegally or unconstitutionally and the federal agent participated in the illegal acquirement, the evidence will not be admissible.[8] This doctrine has been acknowledged in Texas.

"Evidence obtained by federal officers acting lawfully and in conformity to federal authority is admissible in state criminal proceedings." *Gutierrez v. State*, 22 S.W.3d 75, 84 (Tex. App.—Corpus Christi 2000, no pet.) (citing *State v. Toone*, 823 S.W.2d 744, 748 (Tex. App.—Dallas, 1992), *aff'd on other grounds*, 872 S.W.2d 750 (Tex. Crim. App. 1994)).[9] Gutierrez was arrested by federal border patrol agents after being found in possession of about fifty-two pounds of marihuana. The border patrol agents contacted agents of the DEA, who instructed that Gutierrez' case should be turned over to local law enforcement authorities. *Id.* at 78. After finding

---

[8]The United States Supreme Court clarified this doctrine by stressing the primacy of the Fourth Amendment's protections against unreasonable searches and seizures: "[E]vidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures under the Fourth Amendment is inadmissible over the defendant's timely objection in a federal criminal trial." *Elkins v. United States*, 364 U.S. 206, 223 (1960). The evidence in *Elkins* had been obtained by Oregon state law enforcement officers. The Oregon trial and intermediate appellate courts had found the search to be unreasonable and had ordered suppression. Federal agents later obtained the evidence and used it in a federal prosecution. The United States Supreme Court's ruling held that a federal court in such a situation "must make an independent inquiry, whether or not there has been such an inquiry by a state court, and irrespective of how any such inquiry may have turned out. The test is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed." *Id.* at 224.

[9]The Texas Court of Criminal Appeals' affirmance was based on its conclusion that a federal magistrate, who had issued the search warrant, was not listed as one who could issue a warrant under Article 18.01 of the Texas Code of Criminal Procedure, TEX. CODE CRIM. PROC. ANN. art. 18.01, and hence a federal warrant was not a warrant within the meaning and applicability of Article 18.01.

10

the border agents' stop of Gutierrez' vehicle was authorized by federal law, the court of appeals stated the above holding from *Toone* and held that "the trial court did not err in concluding that border patrol agents [were] authorized to release appellant and the evidence seized to state authorities for prosecution." *Id.* at 84.

*Toone* is frequently cited in these cases. A federal postal inspector investigating child pornography being sent through the mail "received several written requests from Toone for various illegal videotapes and publications." *Toone*, 823 S.W.2d at 745. The inspector obtained a federal search warrant and planned to deliver the contraband to Toone's residence while the inspector was disguised as a United States Postal Service employee. In the ensuing search, cocaine was found, and a state prosecution commenced. Toone was also prosecuted in federal court for receiving obscene materials.

Citing *Lustig*, the Dallas Court of Appeals noted that the federal agent in *Toone* legally obtained the evidence "under federal law but in assumed violation of state law." *Id.* at 748. This reverse-silver-platter doctrine allowed admission of Toone's cocaine. Referring to an analysis of the circumstances in a New Jersey silver-platter case,[10] the *Toone* court found that "there [was] no evidence that state officers participated in any way in either the issuance or execution of the search warrant." *Id. Toone* held "that evidence lawfully obtained by federal officers acting under a valid federal search warrant is admissible in state criminal proceedings." *Id.*

---

[10]*State v. Mollica*, 554 A.2d 1315, 1328 (N.J. 1989).

11

In *Pena v. State*, 61 S.W.3d 745 (Tex. App.—Corpus Christi 2001, no pet.), customs agents working a border patrol location detained and searched the defendant and found cocaine and heroin. The customs agents took Pena to talk to a state trooper, but Pena remained in the custom agent's custody.[11] Taking note that "[c]ustoms agents have virtually unfettered authority to search incoming persons at the border" and are "given specific statutory authority" to search for more than $10,000.00 in currency crossing the border either way, the Corpus Christi Court of Appeals found the agents' search of Pena permissible. *Id.* at 753–58. The court rejected Pena's argument that, when the customs agent took Pena to talk to the trooper, the customs agent was acting as an agent for the State of Texas. Invoking the standard established by *Toone*, *Pena* said:

> Evidence of antecedent mutual planning, joint operations, cooperative investigations, or mutual assistance between state and federal officers may sufficiently establish agency and serve to bring the conduct of the federal agents under the color of state law. Conversely, mere contact, awareness of ongoing investigations, or the exchange of information may not transform the relationship into one of agency.

*Id.* at 755. The court of appeals found Pena always remained in the customs agent's custody, even when that agent took Pena to speak with the trooper. There was no evidence the federal officer was acting as an agent for the state "in an effort to circumvent appellant's constitutional rights as prohibited under *Toone*," and the federal agent's search for specific enumerated items and evidence had not been completed when he took Pena to speak to the trooper. Hence the agent's search was "pursuant to [the Customs agent's] ongoing border search . . . ." *Id.* at 757–58.

---

[11]Customs agents and the trooper were participating in an operation where the state was looking for stolen vehicles or vehicles with altered Vehicle Identification Number plates, and customs agents were looking for people taking weapons, ammunition, or more than $10,000.00 in currency across the border into Mexico. *Pena*, 61 S.W.3d at 750.

Also, in *Lockett v. State*, 879 S.W.2d 184 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd), an ATF[12] agent (1) investigated Lockett as a felon in possession of a firearm; (2) developed information that the weapon Lockett allegedly possessed had likely traveled through interstate commerce; and (3) obtained a federal search warrant, which was executed by federal and state officers. A firearm—albeit not the one described in the application for a search warrant—was found, as well as cocaine. *Id.* at 186. "The federal search was terminated," and a state officer obtained a state warrant. *Id.* On appeal the reviewing court found that the federal agent's affidavit for a federal search warrant had sufficient indicia of reliability from which the magistrate could find that the items identified in the affidavit would be found at Lockett's home. The court, reviewing the totality of the circumstances, considered the confidential informants' information corroborated by other investigative means. The state of the information in the affidavit for a search warrant suggested continuous possession of firearms or ammunition; thus, the affidavit established probable cause for issuance of the warrant. *Id.* at 189.

Houlditch emphasizes Brownlee's continued connections with the Longview Police Department, including that (1) Brownlee's paycheck came from that department (although the salary was funded by a federal grant), (2) he wore a Longview Police Department badge, and (3) his retirement and health insurance benefits were administered through the City of Longview. Houlditch argues that, because of Brownlee's continued status as an officer of the Longview Police Department, he was acting as an independent state agent. Houlditch characterizes the federal and state law enforcement agencies as "intertwined" where "antecedent mutual planning, joint

---

[12]Bureau of Alcohol, Tobacco, and Firearms. *See Lockett*, 879 S.W.2d at 186.

operations, cooperative investigations, or mutual assistance between federal and state officers"

brought the conduct of Special Agent Dawson under the ambit of Brownlee's investigative work,

and thus, Houlditch's argument continues, Dawson, a federal agent, was acting "under color of

state law." *Mollica*, 554 A.2d at 1324. Houlditch clarified his position during oral argument,

where he indicated that it is the court where a prosecution ultimately happens that determines

whether the silver-platter doctrine, or, here, reverse-silver-platter, doctrine, will apply.

We do not think the court where a prosecution happens best controls whether the doctrine

should apply. Rather, a more logical starting place would be the investigation, a required precursor

to any potential prosecution. From our reading of the cases discussing and applying the silver-

platter doctrine, the most important consideration is the assurance that the Fourth Amendment's

protections remain in place. The doctrine addresses concerns over sovereignty of different

jurisdictions. "The underlying concept of the silver-platter doctrine is that protections afforded by

the constitution of a sovereign entity control the actions only of the agents of that sovereign entity."

*Toone*, 823 S.W.2d at 748 (citing *Burdeau v. McDowell*, 256 U.S. 465, 475 (1921)).

Where an investigation begins with an eye clearly on the venue in which the case will be

prosecuted, should the evidence provide that option, it makes sense that it is that venue's rules and

procedures that will be followed. As long as there are no contrivances to evade constitutional

protections, it is to be assumed that a properly granted search warrant, valid in its issuing

jurisdiction, will be in compliance with the Fourth Amendment. *See Pena*, 61 S.W.3d at 754.

Thus, the evidence will have been legally obtained. When facts on the ground then necessitate

another jurisdiction pursue prosecution, it is appropriate for the evidence legally obtained under

14

the jurisdiction of Investigating Agency A to hand over that evidence to Investigating Agency B. As long as law enforcement officers from one jurisdiction are not using the doctrine to "circumvent the constitutional requirement of probable cause placed on police officers,"[13] there is a strong indication that the evidence was acquired in good faith. Indeed, in such a situation, the evidence would have been acquired in compliance with the investigating agency's particular warrant requirements, which necessarily will be in compliance with the Fourth Amendment's requirements. *See Heitman v. State*, 815 S.W.2d 681, 682–83 (Tex. Crim. App. 1991) (en banc).

We find no abuse of discretion in the trial court's denial of Houlditch's motion to suppress evidence. Dawson's affidavit established probable cause to justify issuance of the federal search warrant, and the record supports the trial court's conclusion that there was no collusion to violate either the United States or the Texas Constitution. The reverse-silver-platter doctrine allowed admission of the child pornography evidence. This point of error is overruled.

---

[13]*Pena*, 61 S.W.3d at 755 (quoting *People v. Esposito*, 332 N.E.2d 863, 865–66 (N.Y. 1975)).

*(3)     Houlditch Did Not Preserve for Appeal any Complaint Concerning Admission of His Statements in Evidence*

After executing the search warrant, Brownlee accompanied another Secret Service agent, Todd Hiles, to Houlditch's place of employment. The two officers spoke with Houlditch in Brownlee's unmarked police car. Houlditch was not in handcuffs, was not under arrest, and was told he was free to leave. Brownlee sat in the backseat with Houlditch. At some point in the conversation, Houlditch admitted having child pornography on his home computer. After the conversation, Houlditch left. He was not arrested until eight days later.

This issue was not preserved. The motion to suppress made only passing references to Houlditch's statement, and there is no argument that the statement was custodial or that *Miranda v. Arizona*[14] should apply.

More importantly, though, at the beginning of the suppression hearing, Houlditch clearly said that the hearing would only address the search warrant:

> [The State]: Your Honor, I think we can stipulate -- well, actually, Your Honor, I think the way to probably handle this hearing, I believe we'll deal with the warrant first and then after that move to Mr. Houlditch's statement.
> Would that be agreeable?
>
> [Defense counsel]: Actually, it all deals with the warrant. The motion doesn't deal with the interview that was conducted in the back of the --
>
> [The State]: Then we're just dealing with the warrant then.

---

[14]*Miranda v. Arizona*, 384 U.S. 436 (1966).

16

When Brownlee discussed the interview in his testimony, Houlditch lodged no objections and failed to indicate that he wanted statements he made to the officers suppressed. Because this argument has not been preserved, we overrule this point of error.

*(4)     Houlditch's Sentence Is Not Constitutionally Infirm*

Houlditch complains of the trial court's order that the thirty sentences of eight years each shall run consecutively. We disagree with Houlditch's complaint that the stacking of these sentences violates the Eighth Amendment's prohibition against cruel and unusual punishment. *See* U.S. CONST. amend. VIII.

Traditionally, Texas courts have found that, where a particular sentence is within the statutorily authorized range of punishment, such a sentence does not violate the protections against cruel or unusual punishment.[15] *Jackson v. State*, 989 S.W.2d 842, 846 (Tex. App.—Texarkana 1999, no pet.). Nonetheless, an Eighth Amendment claim survives this presumption. *Id.*

A sentence of eight years for a third degree felony, such as possession of child pornography, is within the allowed sentencing range. *See* TEX. PENAL CODE ANN. § 12.34 (West 2011). Stacking, or ordering sentences to run consecutively, is authorized for convictions of possession of child pornography. *See* TEX. PENAL CODE ANN. § 3.03(b)(3)(A) (West Supp. 2014). The trial court's sentences are presumptively proportionate and not cruel or unusual for the offenses of which Houlditch was convicted.

---

[15]The United States Constitution prohibits cruel and unusual punishment, while the Texas Constitution prohibits cruel or unusual punishment. *Compare* U.S. CONST. art. VIII, *with* TEX. CONST. art. I, § 13. Houlditch's argument is made under the United States Constitution.

17

We review claims of constitutionally disproportionate sentences by considering first a "threshold comparison of the gravity of the offense with the severity of the sentence." *Mullins v. State*, 208 S.W.3d 469, 470 (Tex. App.—Texarkana 2006, no pet.). If that "initial comparison create[s] an inference that the sentence was grossly disproportionate to the offense," we then consider "(1) sentences for similar crimes in the same jurisdiction and (2) sentences for the same crime in other jurisdictions."[16] *Id.*

Our initial question is to the gravity of possession of child pornography.[17] That has been deemed a very serious offense:

> Child pornography is the worst type of pornography because it exploits defenseless and vulnerable members of society at a stage of life when they are profoundly impressionable. Even though it is a crime to produce, direct, or distribute child pornography, there is no law prohibiting its possession. It is traumatic enough for children to be photographed, but it is even more traumatic for the child to know that at any given moment the photographs are being distributed for others to see. This bill would effectively curtail the circulation of such material, since people could be prosecuted and sent to prison for possessing it. By thus inhibiting the demand for child pornography, the bill would drastically reduce its production and promotion." The U.S. Supreme Court has already held in *New York v. Ferber*, 458 U.S. 747 (1982), that laws prohibiting the promotion and distribution of child pornography

---

[16]The current standard for reviewing sentences for constitutionality under the Eighth Amendment was enunciated in 1991. *See Harmelin v. Michigan*, 501 U.S. 957 (1991). Justice Kennedy concurred in part in the judgment of that Court. Regarding the analysis of such a claim, he suggested "intrajurisdictional and interjurisdictional analyses are appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." *Id.* at 1005 (Kennedy, J., concurring). Justice Scalia's majority opinion would have done away with the jurisdictional comparisons, but that section of the opinion was not joined by a majority of the Court. *See id.* at 988–89.

[17]Although the images are not contained in the record this Court received, the trial court told Houlditch, just before sentencing him, that it had viewed the images:

> I did spend hours watching the evidence that [the] State was going to present in your case, and I will tell you that it took two different sessions, because I really -- it was upsetting the first time I began viewing this. I had to take a break, and I came back several days later and finished the images. I'm truly glad that I did not have to look at 3,000 images of this. I lost sleep over it. I'll be frank with you about that. It was very upsetting. I don't know what you get from this Mr. Houlditch. I don't know how you are hardwired, that this would be something that you would enjoy.

18

are constitutional. It held that states have a compelling interest in protecting the physical and psychological well-being of minors. *The court noted that child pornography is a permanent record of the child's participation and that the harm to the child is compounded by circulation of the materials*. The Supreme Court would similarly uphold the constitutionality of this bill if it were [sic] ever challenged.

*Vineyard v. State*, 958 S.W.2d 834, 838 n.7 (Tex. Crim. App. 1998) (emphasis added).

It should also be noted that, although there is no evidence that Houlditch personally contacted any children inappropriately and only evidence from his testimony that he had not done so or been so inclined, the record explicitly shows that the trial court personally viewed at least some of the pornography in question and found it quite disturbing. The trial court obviously concluded that the evidence, distinctly including the nature of the materials, warranted a harsh sentencing result. We cannot say that the trial court's sentencing, in light of that evidentiary review, was excessive.

While the trial court's sentences are certainly severe in the aggregate, each sentence is within the authorized punishment range, and consecutive sentences are clearly authorized by law. We find no evidence of a disproportionate sentence in light of the gravity of Houlditch's crimes and the applicable sentencing statutes.[18]

We overrule this point of error.

---

[18]In *Reynolds v. State*, 430 S.W.3d 467 (Tex. App.—San Antonio 2014, no pet.), the defendant entered open pleas to eighty counts of possession of child pornography, and the trial court sentenced him to ten years on each count, running all but eight of the sentences concurrently. This was not found violative of the Eighth Amendment. Houlditch would distinguish this case on its facts. Reynolds had told his wife he would stop viewing the child pornography but continued. He actually traveled to Arkansas to try to make contact with one child. Houlditch testified that he never sought out or was tempted to engage in sexual contact with children, and there was no evidence he ever tried. We do not find this distinction persuasive. Further, in *Williamson v. State*, 175 S.W.3d 522, 524 (Tex. App.—Texarkana 2005, no pet.), we found no showing of a disproportionate sentence where the defendant received three stacked life sentences for three convictions of aggravated sexual assault of a child.

We affirm the trial court's judgment and sentence.


Josh R. Morriss, III
Chief Justice

Date Submitted:     September 2, 2015
Date Decided:      October 30, 2015

Do Not Publish